UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

LUC QUY TRAN,

           Petitioner,

      v.

Case No. 2:25-cv-1224-KCD-NPM

WARDEN, FLORIDA SOFT SIDE
SOUTH DETENTION CENTER,
MIAMI FIELD OFFICE
DIRECTOR, IMMIGRATION AND
CUSTOMS ENFORCEMENT'S
ENFORCEMENT AND REMOVAL
OPERATIONS, ACTING
DIRECTOR OF IMMIGRATION
AND CUSTOMS ENFORCEMENT,
SECRETARY OF HOMELAND
SECURITY,  U.S. ATTORNEY
GENERAL,

           Respondents.

_____/

## **ORDER**

Petitioner Luc Quy Tran is a Vietnamese national who arrived in the United States as a child. He was later convicted of murder, and an immigration judge ordered his removal. *See Tran v. State*, 667 So. 2d 812 (Fla. Dist. Ct. App. 1995).[1] Because the Government could not effectuate his return to Vietnam due to repatriation issues, U.S. Immigration and Customs

---

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

Enforcement ("ICE") released him on an order of supervision in 2003. (*See* Doc. 1 at 1-2.)

For over twenty years, Tran lived in the community and apparently complied with his conditions of release. But then, on December 9, 2025, ICE abruptly revoked his supervision and detained him. (*Id.* at 2.) ICE cited changed circumstances and a significant likelihood of removal in the foreseeable future, pointing specifically to a new plan to remove him to Mexico. (*See* Doc. 10-1.) Tran was provided an informal interview on the day of his arrest. (*Id.* at 7.)[2] This petition for a writ of habeas corpus followed, alleging violations of the Fifth Amendment, the Immigration and Nationality Act ("INA"), the Administrative Procedure Act, and the Accardi doctrine. (*See* Doc. 1.)

The Government meets the petition with two arguments. First, it asserts that the INA strips this Court of subject-matter jurisdiction. (Doc. 10 at 3-8.) Second, on the merits, the Government contends the detention is legally sound because Tran is well within the presumptively reasonable period of detention and ICE complied with its regulatory obligations. (*Id.* at 8-22.)

---

[2] For ease of reference, the Court will cite the page numbers generated by its electronic filing system for all exhibits.

2

The Court is satisfied it has jurisdiction. But on the merits, the Government is right. The petition is therefore **DENIED WITHOUT PREJUDICE**.

## I. Legal Framework

The federal habeas statute, 28 U.S.C. § 2241, provides authority to issue writs of habeas corpus when an individual is "[i]n custody in violation of the Constitution or law or treaties of the United States." *Id.* § 2241(c)(3). "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001). "Section 2241 authorizes federal courts to hear challenges to immigration detention." *Grigorian v. Bondi*, No. 25-CV-22914-RAR, 2025 WL 2604573, at *2 (S.D. Fla. Sept. 9, 2025).

## II. Discussion

The Government first claims that two provisions of the INA—8 U.S.C. § 1252(g) and § 1252(b)(9)—strip this Court of jurisdiction. The argument goes like this: Tran is being detained so he can be removed; therefore, his lawsuit arises from the "execution" of a removal order, and Congress has said district courts cannot touch that.

The Government's reading is too broad. It treats the INA's jurisdiction-stripping provisions like a black hole, sucking in any claim that has even a

tangential relationship to a removal order. But the Supreme Court has told us to read these statutes much more narrowly. *See Jennings v. Rodriguez*, 583 U.S. 281, 292-96 (2018).

First up, § 1252(g) says that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." *Id.* This provision "limits habeas corpus jurisdiction, including under § 2241." *Islas v. DHS/ICE Off. of Chief Couns. - ATD*, No. CV 323-002, 2023 WL 2761710, at *1 (S.D. Ga. Jan. 23, 2023); *see also Wallace v. Sec'y, U.S. Dep't of Homeland Sec.*, 616 F. App'x 958, 961 (11th Cir. 2015).

But § 1252(g) does not cover "all deportation-related claims." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 478 (1999). It has a far narrower reach. It forecloses judicial review of three discrete actions by the Attorney General: her "decision or action to commence proceedings, adjudicate cases, or execute removal orders." *Id.* at 482. As the Supreme Court recently reiterated, § 1252(g) does not "sweep in any claim that can technically be said to arise from the three listed actions." *Jennings*, 583 U.S. at 294. Instead, it "refer[s] to just those three specific actions themselves." *Id.*

Tran's petition steers clear of those forbidden actions. He is not asking this Court to vacate his removal order or to stop the Government from

4

putting him on a plane. Instead, he is challenging the procedural mechanics of his current detention. His argument is that the Government failed to follow its own rulebook when it revoked his release. Specifically, it skipped the required interview and allowed an unauthorized official to sign the revocation notice. A claim that the Government locked someone up in violation of binding regulations challenges the detention process, not the commencement or execution of a removal order. *See, e.g., Navarro v. Bondi*, No. 8:25-CV-3213-KKM-NHA, 2025 WL 3275944, at *2 (M.D. Fla. Nov. 25, 2025).

The core of this case is not about the Attorney General's decision to detain Tran. It's about whether the Government followed its own regulations in that process. (*See* Doc. 1.) Such a claim is best understood as independent of, and collateral to, removal because it may be resolved without affecting the Attorney General's prosecutorial discretion that § 1252(g) was meant to preserve. *See Reno*, 525 U.S. at 485 n.9 ("Section 1252(g) was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion."); *see also Arroyo v. Diaz*, No. 25-62676-CIV, 2026 WL 279656, at *4 (S.D. Fla. Feb. 2, 2026); *Banega v. Noem*, No. 2:25-CV-1152-JES-DNF, 2026 WL 234042, at *2 (M.D. Fla. Jan. 29, 2026).

Next up is the so-called "zipper clause," which "bars review of claims arising from 'action[s]' or 'proceeding[s]' brought to remove an alien.'" *DHS v.*

*Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020) (quoting 8 U.S.C. § 1252(b)(9)). This discussion can be short. The Eleventh Circuit has held "that the zipper clause only affects cases that involve[] review of an order of removal." *Canal A Media Holding, LLC v. United States Citizenship & Immigr. Servs.*, 964 F.3d 1250, 1257 (11th Cir. 2020). Tran is not challenging a removal order. So "the Government's reliance on § 1252(b)(9) is misplaced." *Fernandez-Garcia v. U.S. Att'y Gen.*, No. 1-20-CV-23599-UU, 2021 WL 8821923, at *5 (S.D. Fla. Apr. 15, 2021).

With the jurisdictional underbrush cleared away, the Court can turn to the merits. Tran's claims are addressed below.

**Count I—Substantive Due Process**

Invoking the Fifth Amendment, Tran first claims that his continued detention serves no legitimate, non-punitive immigration purpose. And locking a person up indefinitely without a valid plan for removal, like here, is exactly the kind of arbitrary deprivation of liberty that the Constitution forbids. (Doc. 1 at 20-23.)

A bit of statutory background helps set the stage for this issue. When a noncitizen is subject to a final removal order, like here, the INA starts a 90-day clock. 8 U.S.C. § 1231(a). During that window, the government must keep the noncitizen detained. *Id.* § 1231(a)(2). If that initial period expires without a successful removal, the government has a choice: it may release the

individual on supervision or keep them locked up. *Id.* § 1231(a)(6). Read literally, the statute places no outer limit on that continued confinement. But holding someone indefinitely is a constitutional non-starter. So, the Supreme Court read a practical limitation into the text. *Zadvydas v. Davis*, 533 U.S. 678 (2001). The government, the Court held, may only detain a noncitizen for a period "reasonably necessary" to actually bring about their removal. *Id.* at 701. And to give lower courts a workable yardstick, the Court drew a line at six months: any post-removal detention lasting six months or less is "presumptively reasonable." *Id.* "In order to state a claim under *Zadvydas*," then, "the alien not only must show post-removal order detention in excess of six months but also must provide evidence of a good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Akinwale v. Ashcroft*, 287 F.3d 1050, 1052 (11th Cir. 2002).

Apply that framework here, and Tran's claim immediately runs into a math problem: he has not been detained long enough. ICE grabbed him on December 9, 2025. Because he has been in custody just under three months, he remains squarely within the window in which his detention is presumptively reasonable. *See Guerra-Castro v. Parra*, No. 1:25-CV-22487, 2025 WL 1984300, at *4 (S.D. Fla. July 17, 2025) (finding habeas petition "premature" because "Petitioner has not been detained for more than six months"); *see also Jiang v. Mukasey*, No. 208-CV-773-FTM-29DNF, 2009 WL

7

260378, at *2 (M.D. Fla. Feb. 3, 2009); *Noel v. Glades Cnty. Sheriff*, No. 2:11-CV-698-FTM-29, 2011 WL 6412425, at *2 (M.D. Fla. Dec. 21, 2011).

Recognizing this hurdle, Tran attempts a workaround. He first argues that the six-month reasonable detention period "is tied to the beginning of the statutory removal" and not physical custody. (Doc. 15 at 2.) In other words, "the six-month period begins at the start of the removal period, regardless of the petitioner's actual detention status." (*Id.* at 3.) Tran was released from mandatory detention back in 2003, which means the "six-month period has long since passed, the *Zadvydas* burden-shifting framework applies, and the claim is not premature." (*Id.*)

This argument makes little sense. *Zadvydas* was aimed at the severe, physical deprivation of liberty that comes from sitting in a jail cell indefinitely. The Court "used the words 'detain' and 'custody' to refer exclusively to physical confinement and restraint." *Jennings*, 583 U.S. at 311. Against that backdrop, it is illogical to run a clock designed to prevent indefinite imprisonment while a person is out living freely in the community. "Because *Zadvydas* clearly involved *detention* of a petitioner during the presumptively reasonable period, it defies common sense to suggest that *Zadvydas* time can run while a petitioner is not in custody." *Cheng Ke Chen v. Holder*, 783 F. Supp. 2d 1183, 1192 (N.D. Ala. 2011). The six-month clock measures actual lockup, not supervised freedom. *See Akinwale*, 287 F.3d at

8

1052 ("[I]n order to state a claim under *Zadvydas* the alien ... must show post-removal order *detention* in excess of six months [and] also must provide evidence of a good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." (emphasis added).)

Tran also suggests that the Court should count his prior confinement towards the six-month threshold. (Doc. 1 at 17, 20-23.) He points out that he spent 90 days in immigration detention back in 2003 before his release on supervision. (Doc. 1 at 17.) By combining these distinct periods of confinement, Tran proffers that his total time in civil immigration detention exceeds the six-month threshold, which is sufficient to trigger the *Zadvydas* review.

District courts are split on whether prior time in ICE custody should be aggregated to satisfy the six-month *Zadvydas* clock. Some have firmly rejected this cumulative approach. They reason that if "detentions [are counted] in the aggregate, any subsequent period of detention, even one day, would raise constitutional concerns." *Barrios v. Ripa*, No. 1:25-CV-22644, 2025 WL 2280485, at *8 (S.D. Fla. Aug. 8, 2025). Because the executive branch is tasked with great deference in effectuating removals, these courts warn that constantly adjudicating the constitutionality of every brief re-detention would improperly obstruct that statutory discretion. *Meskini v. Att'y Gen. of U.S.*, No. 4:14-CV-42 (CDL), 2018 WL 1321576, at *3 (M.D. Ga.

9

Mar. 14, 2018). Under this view, *Zadvydas* does not function as a "Get Out of Jail Free Card that may be redeemed at any time just because an alien was detained too long in the past." *Id.*; *see also Flores-Reyes v. Assistant Field Off. Dir.*, No. 26-CV-20226, 2026 WL 406708, at *2 (S.D. Fla. Feb. 13, 2026).

Conversely, other courts have treated the *Zadvydas* period as cumulative. *Chen v. Holder*, No. CV 6:14-2530, 2015 WL 13236635, at *2 (W.D. La. Nov. 20, 2015). This approach is driven by the constitutional imperative to prevent the government from indefinitely detaining noncitizens through a loophole of release and re-detention. *Krechmar v. Parra*, No. 2:25-CV-01095-SPC-DNF, 2025 WL 3620802, at *3 (M.D. Fla. Dec. 15, 2025). To consider only the current, isolated period of confinement—ignoring all prior custody—would allow the government to bypass *Zadvydas* through successive detentions. For these courts, aggregation is the only way to safeguard against the precise danger of indefinite detention that the Supreme Court sought to prevent. *See Rodriguez Romero v. Ladwig*, No. CV 25-1106-JWD-EWD, 2026 WL 321437, at *12 (M.D. La. Feb. 6, 2026).

This Court declines to endorse a blanket rule that all prior periods of confinement automatically aggregate to satisfy the *Zadvydas* six-month clock. Such a categorical approach is practically unworkable and effectively penalizes the government for its past lawful actions. If every prior day spent in immigration custody simply rolled over into the present calculus, the

10

government's statutory authority to briefly re-detain a noncitizen to finalize a removal would be severely restricted, if not eliminated entirely. The six-month period established in *Zadvydas* was designed to provide the government a functional window to negotiate with foreign nations, secure travel documents, and coordinate the complex logistics of deportation. A strict aggregation rule ignores the reality that diplomatic circumstances evolve. If a foreign government that previously refused repatriation suddenly agrees to issue travel documents, the United States needs a practical opportunity to effectuate that newly viable removal. Mandating an automatic rollover of all past detention would force the immediate release of a noncitizen even when their current custody is driven by an imminent, foreseeable deportation, ultimately frustrating the core purpose of the removal statute.

Instead, the better approach is to afford the government a new six-month presumptively reasonable period for each discrete detention, unless there are facts suggesting the government is acting with an improper motive. If the record reveals a calculated pattern of catch-and-release designed merely to reset the *Zadvydas* clock or evade judicial review, aggregation may be entirely appropriate. But absent evidence of such bad faith or a deliberate strategy of looping confinement, courts should presume that a subsequent detention is a genuine, independent effort to effectuate removal. This standard strikes the appropriate balance. It alleviates constitutional concerns

11

regarding indefinite, cyclical detention by providing a safeguard against abuse, while simultaneously protecting the government's legitimate, statutory interest in finalizing deportations when logistical or diplomatic circumstances finally permit.

This approach finds support in both the reasoning of *Zadvydas* and the historical foundations of the vehicle Tran employs (habeas corpus). In *Zadvydas*, the Supreme Court eschewed a rigid, mechanical formula, focusing instead on whether the length of detention remains "reasonably necessary to secure removal." 533 U.S. at 699. The Court explicitly instructed lower courts to measure reasonableness in light of the specific circumstances of the case and the actual likelihood of a future deportation. *Id.* ("It should measure reasonableness primarily in terms of the statute's basic purpose, namely, assuring the alien's presence at the moment of removal."). That directive undermines the logic of a blind, automatic aggregation of prior custody days here. *See also Meskini*, 2018 WL 1321576, at *3.

A flexible standard also aligns with the fundamental principle that habeas corpus is "at its core, an equitable remedy." *Munaf v. Geren*, 553 U.S. 674, 693 (2008). Because habeas relief is governed by equitable principles, courts are empowered to look beyond a mere mathematical tally to examine the totality of the circumstances. *Id.*; *see also Duckworth v. Eagan*, 492 U.S. 195, 213 (1989) (O'Connor, J., concurring) ("[T]he Court has long recognized

12

that habeas corpus [is] . . . governed by equitable principles[.]"). By inquiring into whether the government has engaged in a deliberate cycle of release and re-detention, the court exercises its equitable discretion to prevent gamesmanship, all while preserving the executive branch's necessary flexibility to enforce the immigration laws.

Applying this standard here, Tran's argument for aggregation falls short. While he points to his prior period of ICE custody, the record is devoid of evidence that immigration officials manipulated his release and rearrest to bypass the six-month presumption or avoid judicial oversight. Without proof of such tactical maneuvering, this Court treats his present custody as an independent, good-faith endeavor to secure his deportation.

As the Supreme Court has long recognized, "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process." *Demore v. Kim*, 538 U.S. 510, 523 (2003). So the executive branch gets a presumptively reasonable six-month runway to do its job, negotiate with foreign governments, and execute a final removal order. *Zadvydas*, 533 U.S. at 701. Because Tran remains inside that window, his current custody does not cross the line into the kind of indefinite, arbitrary lockup the Fifth Amendment forbids. Until that clock actually runs out, the Government retains the statutory authority to hold him while it works to put him on a plane. Count I is therefore rejected.

13

### Count II—Procedural Due Process

Tran turns next to the procedural mechanics of his re-detention. In Count Two, he claims that ICE's decision to revoke his supervision violated the Fifth Amendment's guarantee of procedural due process. As Tran tells it, the agency threw him back behind bars after twenty-two years of supervised freedom without fair warning or a chance to defend his liberty. The Constitution, he says, requires more. (*See* Doc. 1 at 23-27.)

The Court cannot agree. To understand why, start with the baseline reality of Tran's legal status. He is a noncitizen subject to a final, unexecuted order of removal following a murder conviction. His release on supervision back in 2003 was a matter of administrative grace born of logistical necessity, not a permanent constitutional entitlement. When the Government determines that circumstances have changed and it is finally time to carry out its removal order, the Constitution does not demand a full-dress, pre-deprivation trial. Due process, as the Supreme Court has often reminded us, is flexible. It "calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

In the context of revoking a noncitizen's supervised release, ICE's regulations strike that constitutional balance by guaranteeing written notice and an informal interview that allows the individual to respond. *See* 8 C.F.R. §§ 241.4(l)(1), 241.13(i). These guardrails are undoubtedly sufficient

14

considering the interests at play. And Tran offers no authority to the contrary. *See Valdes-Santovenia v. Ripa*, No. 2:25-CV-01063-JES-DNF, 2025 WL 3771264, at *3 (M.D. Fla. Dec. 31, 2025); *cf. Daniels v. Tampa Police Dep't*, No. 8:25-CV-01529-WFJ-AEP, 2025 WL 2959658, at *3 (M.D. Fla. Oct. 20, 2025) ("[P]rocedural due process guarantees fair procedure and requires notice and an opportunity to be heard before any governmental deprivation of a [constitutionally-protected] interest.").

According to the unrebutted record here, ICE provided Tran with notice of the revocation and an informal interview on December 9, the very day he was detained. (*See* Doc. 10-1.) To be sure, Tran quibbles with the exact form and content of that notice—and the Court will take up those specific regulatory grievances below. But strip away the administrative labels, and the constitutional picture is clear. For purposes of the Fifth Amendment, the process he received clears the bar. Due process is not a rigid straitjacket. It requires only that the Government provide fair notice and a meaningful opportunity to be heard. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). By handing Tran a written notice that identified the agency's decision and sitting him down for an interview to present rebuttal evidence, ICE gave him exactly that.

Tran may vigorously dispute the agency's underlying rationale— namely, its sudden confidence that it can effectuate his removal to Mexico —

15

but that gets him nowhere on this procedural claim. The Constitution guarantees a fair process, not a favorable result. Because ICE afforded Tran the requisite notice and a meaningful opportunity to be heard, his procedural due process claim fails.

### Count III—Administrative Procedure Act

Quoting the Administrative Procedure Act's familiar standard, Tran asks the Court to set aside his re-detention as "arbitrary and capricious." (Doc. 1 at 28.) The substance of this claim is brief and, to put it bluntly, conclusory. Tran declares that his re-detention violates the Constitution and agency regulations. But he stops right there, leaving the Court to guess which facts he thinks actually turn those labels into a winning argument (*Id.*) This alone is fatal. A petitioner cannot just drop a legal standard on the table and expect the dots to connect themselves. In our system, a party has to do the heavy lifting of showing why agency action is legally infirm. *See United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) ("American courts function in an adversarial system of adjudication whereby we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.").

But even if Tran had put some meat on those bones, the claim would still run into a brick wall. The APA is the law's version of a backup plan—a residual remedy that kicks in only when there is "no other adequate remedy

16

in a court." 5 U.S.C. § 704. Here, Tran has a perfectly adequate remedy: the very habeas petition he used to get through the courthouse doors in the first place. See *Trump v. J.G.G.*, 604 U.S. 670, 674 (2025) (Kavanaugh, J., concurring). Because the writ of habeas corpus exists specifically to challenge the fact or duration of physical confinement, it leaves no room for a redundant APA tag-along. So no matter how you slice it, Count III is out. *See, e.g., Fleurimond v. Noem*, No. CV-26-00037-PHX-MTL (CDB), 2026 WL 507542, at *3 (D. Ariz. Feb. 24, 2026) (explaining why APA claim is improper in this context)*, Rivera v. Noem*, No. 1:25-CV-01289 KWR-KBM, 2026 WL 381309, at *7 (D.N.M. Feb. 11, 2026) (same).

### Count IV—Accardi Doctrine

The Accardi doctrine—derived from *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)—"stands for the unremarkable proposition that an agency must abide by its own regulations." *Chevron Oil Co. v. Andrus*, 588 F.2d 1383, 1386 (5th Cir. 1979). "It goes without saying that ICE, like all government agencies, must follow its own regulations." *Roble v. Bondi*, 803 F. Supp. 3d 766, 774 (D. Minn. 2025). "[A]gency deviation from its own regulations and procedures may justify judicial relief in a case otherwise properly before the court." *Jean v. Nelson*, 727 F.2d 957, 976 (11th Cir. 1984).

As Tran tells it, ICE ignored the rules when it revoked his supervised release. Pointing specifically to 8 C.F.R. §§ 241.4 and 241.13, he rattles off a

17

laundry list of alleged procedural missteps. First, he claims the revocation was ordered by a subordinate officer who lacked proper authority. (Doc. 1 at 29-30.) Second, he says ICE failed to establish the "changed circumstances" needed to justify locking him back up. (*Id.*) And finally, he argues the agency skipped the required written notice and denied him a prompt informal interview to contest the decision. (*Id.*) Because ICE supposedly cut these regulatory corners, Tran insists his detention is legally void, and he must be released.

Start with the signature line on the revocation notice. Tran complains that a subordinate officer, rather than a top-tier executive like the field office director, signed his paperwork. He insists this technicality voids the entire revocation. *See* 8 C.F.R. § 241.4(l)(2); *cf. Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 160 (W.D.N.Y. 2025) ("[U]nder § 241.4(l)(2), the officials with the power to revoke release after making certain findings include field office directors and any other officials delegated the function or authority ... for a particular geographic district, region, or area.").

But there is a fundamental problem with this point: Tran is reading the wrong regulation. He was originally released back in 2003 because his removal to Vietnam was not reasonably foreseeable. That puts his case on a different regulatory track, one governed by 8 C.F.R. § 241.13. When the Government decides it is time to again detain someone on that specific track,

18

it must follow the revocation procedures from § 241.13. *See Choy v. Woosley*, No. 4:25-CV-197-DJH, 2026 WL 324601, at *3 (W.D. Ky. Feb. 6, 2026). Indeed, Tran argues that § 241.13 governs here. (Doc. 15 at 7.)

Here is the catch: unlike its counterpart, § 241.13 contains no rigid signature requirement limiting revocation authority to field office directors or other specific high-ranking officials. It simply says the agency can revoke an order of supervision if changed circumstances mean removal is now significantly likely. Tran is trying to borrow a procedural hurdle from a completely different regulation and wedge it into his case. But a petitioner cannot mix and match regulatory provisions to manufacture an Accardi violation. *Cf. Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008) ("It is the petitioner's burden to establish his right to habeas relief and he must prove all facts necessary to show a constitutional violation.").

Next, Tran takes aim at the agency's underlying justification for the revocation, arguing ICE failed to establish the "changed circumstances" required to pull him off supervised release. (Doc. 1 at 33.) He claims there is no hard evidence that his removal is any more likely today than it was two decades ago. But the regulations do not demand a full-blown evidentiary trial or a judicial-style opinion before ICE can yank an alien back from release. Section 241.13(i) leaves the determination of whether "circumstances have changed" squarely in the agency's hands. *Id*. To the extent this Court has any

role in questioning that operational judgment, our posture must be highly deferential. As the Supreme Court has cautioned, we "must take appropriate account of the greater-expertise of the Executive Branch, of the serious administrative needs and concerns inherent in the necessarily extensive ... efforts to enforce this complex [area law of law], and the Nation's need to speak with one voice in immigration matters." *Zadvydas*, 533 U.S. at 700. So "the Court's review of the respondents' determination that there are changed circumstances in this case is necessarily limited." *Nguyen v. Noem*, 797 F. Supp. 3d 651, 666 (N.D. Tex. 2025).

ICE easily clears that deferential bar. Look at what the agency is actually doing here. It is not just banging its head against the same wall, hoping Vietnam will suddenly change its tune after twenty-two years. Instead, ICE has pivoted to an entirely new strategy: it is now attempting to relocate Tran to a third country—Mexico. That geographical shift matters. The specific diplomatic roadblocks, repatriation dead-ends, and missing paperwork that thwarted his return to Vietnam back in 2003 simply do not apply to this new destination. When the Government pursues a completely different diplomatic route, it stands to reason that the old obstacles are left behind. For the agency's purposes under the regulations, charting a new course to a new country is the very definition of a changed circumstance.

Citing several out-of-circuit cases, Tran instead proposes that ICE was obligated to document the "changed circumstances" that make removal likely and relay that determination. (Doc. 15 at 9.) This argument stems from *Kong v. United States*, 62 F.4th 608, 619-20 (1st Cir. 2023). There, the First Circuit held that "ICE's own regulation require[ed] (1) an individualized determination (2) by ICE that, (3) based on changed circumstances, (4) removal has become significantly likely in the reasonably foreseeable future." *Id.* at 619-20. This level of detail was needed, the court explained, because a revocation decision should be reviewed "in light of the regulations instructing ICE on how it should make such a determination. *See* 8 C.F.R. §§ 241.13(f)."

But there is a glaring problem with that logic: it reads the wrong part of the rulebook. The First Circuit in *Kong* grabbed a demanding checklist from subsection (f) and grafted it onto the revocation process. The trouble is, § 241.13(f) has nothing to do with revoking supervised release. That provision governs something else entirely—the agency's process for evaluating an alien's initial request for release and determining if there is a significant likelihood of removal in the first place. *See Nguyen*, 797 F. Supp. 3d at 666-67.

When ICE decides to *revoke* an existing order of supervision and bring someone back into custody, a completely different provision takes the wheel: § 241.13(i). And subsection (i) simply does not demand the exhaustive, show-

21

your-work fact-finding required by subsection (f). It asks only that the agency determine circumstances have changed and notify the noncitizen of its decision. Courts have no business slicing requirements out of one regulatory provision and pasting them into another just to second-guess the executive branch. Because it makes no sense to jam the strict requirements of subsection (f) into the separate process governed by subsection (i), *Kong*'s demanding requirements fall flat. *See Nguyen*, 797 F. Supp. 3d at 667.

Tran is essentially asking this Court to look over the agency's shoulder and second-guess its operational assessment of its own removal prospects. But the law affords the Government broad discretion to decide when to enforce a removal order, and ICE exercised that discretion here and documented its decision accordingly. *See Morales Sanchez v. Bondi*, No. 5:25–CV–02530–AB–DTB, 2025 WL 3190816, at *3 (C.D. Cal. Oct. 3, 2025). That kind of executive judgment comes with a presumption of regularity, and Tran offers nothing more than his own skepticism to rebut it. Much more is required for this Court to step in and declare ICE's conduct unconstitutional. *See Lewis v. United States*, 279 U.S. 63, 73 (1929) ("It is the settled general rule that all necessary prerequisites to the validity of official action are presumed to have been complied with, and that where the contrary is asserted it must be affirmatively shown.").

22

As a corollary to the argument above, Tran also claims that the notice he received did not "detail[ ]the reasons for the revocation" as required. (Doc. 1 at 29.) The Court cannot agree. Section 241.13(i) gives the agency two reasons to revoke an order of supervision: either the noncitizen violated the conditions of his release, or the Government is ready to effectuate his removal. 8 C.F.R. § 241.13(i). The written notice handed to Tran checked that second box, explicitly stating that his supervision was ending so the agency could execute his final removal order. (Doc. 10-1 at 5.) It also confirmed that the agency had made this decision based on a review of his case and the available removal options. Elsewhere, Tran was told that the specific destination was Mexico. (*Id.* at 1.) That maps perfectly onto the regulation's demands. The notice did not hide the ball—it told Tran exactly why his supervised freedom was ending and why he was returning to custody. "There is not much more information a notice could include that would give an alien a more concrete reason for their revocation." *Doe v. Easterwood*, No. 25-CV-196 CJW-KEM, 2025 WL 4093531, at *6 (N.D. Iowa Dec. 5, 2025); *see also Tran v. Baker*, No. 1:25-CV-01598-JRR, 2025 WL 2085020, at *4 (D. Md. July 24, 2025).

Finally, Tran claims that ICE completely skipped the "prompt informal interview" to contest his sudden return to custody. (Doc. 1 at 30.) But the record tells a different, unrebutted story. The Government produced

23

interview notes showing ICE sat Tran down on December 9—the very day he was detained. (Doc. 10-1 at 7.) A petitioner cannot just wave away the Government's receipts with a blanket denial. And here, Tran did not even try. He had a clear shot in his reply brief to rebut those notes but offered only silence. Because Tran left the agency's contemporaneous paperwork entirely unchallenged, his claim that ICE skipped this step simply ignores reality.

One last issue. Tran proclaims that because his notice of revocation cited § 241.4 instead of the correct regulation, § 241.13, the Government is stuck with a defective rationale and cannot pivot now. But that argument mistakes a typo for a substantive legal failure. To be sure, an agency cannot invent new, post-hoc justifications for its actions once it gets to court. *See Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947). But that rule is about the agency's actual reasons, not a game of regulatory gotcha. *See Mass. Trs. of E. Gas & Fuel Assocs. v. United States*, 377 U.S. 235, 248 (1964). The substance of the notice Tran received did exactly what § 241.13(i) requires: it informed him that his supervision was ending so the Government could execute his removal order. The agency's core rationale has not changed between the time ICE handed him the paper and the time the Government filed its brief; only the citation did. Slapping the wrong alphanumeric label on the paperwork does not erase the fact that the agency's actual, articulated reasoning was perfectly sound under the correct regulatory framework. In

24

administrative law, we care about the contents of the box, not just the sticker on the outside. *Id.* ("[*Chenery* and its progeny is] aimed at assuring that initial administrative determinations are made with relevant criteria in mind and in a proper procedural manner; when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached . . . the sought extension of the cases cited would not advance the purpose they were intended to serve.").

In the end, Tran has failed to show that the notice he received deviated from the rulebook. The Government gave him the why and the when, which is all § 241.13(i) requires. But even if we were to spot him a procedural foul—a misplaced signature, a sloppy citation, or a truncated explanation—that still would not unlock his cell door. The writ of habeas corpus is a profound remedy, not a penalty for bureaucratic typos. *Munaf*, 553 U.S. at 693 ("The habeas statute provides only that a writ of habeas corpus 'may be granted,' and directs federal courts to 'dispose of [habeas petitions] as law and justice require.'"). Even if the agency's initial administrative process was somehow lacking, Tran can hardly complain that he is being denied a meaningful opportunity to be heard *now*. Through this very habeas proceeding, he has had a full chance to review the Government's evidence, file his briefs, and press his legal arguments before an Article III court. He has had his say. Because this litigation itself has provided him with the exact procedural

25

safeguards he claims to have missed, the Court declines to use the extraordinary tool of habeas relief to simply wipe the slate clean. "Because habeas is not backward-looking, the process provided now renders forward-looking relief separately inappropriate." *Ladak v. Noem*, No. 1:25-CV-194-H, 2025 WL 3764016, at *5 (N.D. Tex. Dec. 30, 2025).

**Count V—Third County Removal**

Lastly, Tran shifts his focus from the fact of his detention to his ultimate destination. The Government has made clear that its endgame is to remove him not to Vietnam, but to Mexico. In response, Tran claims that his removal must be preceded by "meaningful notice and an opportunity to respond and apply for fear-based relief as to that country, in compliance with the INA [and] due process." (Doc. 1 at 36.) According to Tran, however, "current ICE policy" does not adhere to these requirements. So, he seeks "an order that he not be summarily removed to any third countries unless and until he is provided constitutionally adequate procedures." (*Id.* at 36-37.)

This claim hits a few roadblocks. First, it puts the cart before the horse. Tran is sitting in a detention center, not standing on the tarmac waiting to board a flight to Mexico. And crucially, he has not shown that he actually attempted to use the agency's established administrative procedures to challenge this new destination. *See* 8 U.S.C. § 1231(b)(C). Nor does he claim the Government shut the door on him making that argument. For that

matter, he fails to even explain what ICE's supposed "current policy" actually is or where anyone might find it. Tran is asking the Court to preemptively referee a dispute that has not even played out at the agency level. As it stands, then, his grievance is purely hypothetical. *See Coker v. Austin*, 688 F. Supp. 3d 1116, 1121 (N.D. Fla. 2023) ("Federal courts cannot adjudicate hypothetical or abstract disputes, or exercise general legal oversight of the Legislative and Executive Branches.").

But even if his claim were ripe, there is a jurisdictional problem. (Doc. 1 at 37.) Under the INA, district courts are stripped of jurisdiction to award injunctive relief that restrains or prevents the execution of a removal order. *See* 8 U.S.C. § 1252(g). That statutory command leaves no room to maneuver. We do not get to play travel agent, and we certainly have no business micromanaging ICE's diplomatic itinerary. *See Camarena v. Dir., Immigr. & Customs Enf't*, 988 F.3d 1268, 1273 (11th Cir. 2021). Because Tran is seeking a preemptive injunction to block his removal, he is asking for something this Court lacks the power to grant. *See Edwin M.-N. v. Green*, No. CV 19-6096 (KM), 2019 WL 13299141, at *2 (D.N.J. Feb. 19, 2019) ("Courts across the country have thus found that they are barred from staying removal, even when the court might otherwise have jurisdiction over the [underlying] claims presented."). For these reasons, Count V cannot get off the ground either.

27

## IV. Conclusion

Tran has not been detained long enough to transform his authorized custody into a due process violation under *Zadvydas*. And his remaining arguments—whether grounded in administrative technicalities or a premature challenge to his ultimate destination—simply do not warrant the extraordinary remedy of habeas relief. The Government is actively working to execute his removal, and it has cleared the necessary regulatory hurdles to keep him in custody while it does so. Because Tran's current detention remains lawful, his petition (Doc. 1) must be **DENIED WITHOUT PREJUDICE**. The Clerk is **DIRECTED** to enter judgment accordingly, terminate any pending motions, and close the case.

**ORDERED** in Fort Myers, Florida on March 9, 2026.

Kyle C. Dudek
United States District Judge

28